ALBANY,
Feb 1811.

LE ROY
v.
UNIT. INS. Co.

---

LE ROY and others *against* THE UNITED INSURANCE COMPANY.

THIS was an action on an. *open* policy of insurance on *goods*, laden on board of the *American* brig *Minerva*, at and from *New-York* to *Amsterdam*. There was a *special verdict*, which contained the following facts. The policy was dated the 7th of *July*, 1807, and contained a *memorandum* at the bottom, by which the insured " warranted the property thereby insured to be *American* property, proof whereof, if required, to be made in *New-*

*A quantity of hides* were purchased at *Montevideo* for *American* merchants, and shipped on board of an *American* vessel for *New-York*, and an *export duty* on the hides was paid to the officers of the *Spanish* government, and the

vessel was ready for sea, but was prevented sailing by a *British* squadron, which afterwards captured the place, and was not permitted to sail until she had paid an export duty on the cargo to the officers of the *British* government. On the arrival of the vessel at *New-York*, the hides were sold to *American* merchants in *New-York*, who shipped them in another *American* vessel to *Amsterdam*, accompanied with a *certificate of origin* from the *French* consul in *New-York*, declaring that " they were purchased and exported from *Montevideo*, prior to the capture of that place by the *British;*" which certificate was a usual and customary document on board *American* vessels bound to *France* or *Holland*, and rendered necessary by the decrees of *France* and *Holland*. The vessel was captured by the *British*, and condemned as enemy's property, or otherwise subject to forfeiture, on the ground of a continuity of voyage from an enemy's colony to the mother country of an enemy of *Great Britain*. The hides were purchased the 24th *June* at 10 cents per pound, and transhipped about the 7th *July*, and were invoiced at 12 cents per pound, being the value thereof at the time. In an action on an open policy of insurance on the hides, it was held, that the certificate of origin being a customary document for such a voyage, and substantially true, and put on board, *bona fide*, by the insured, there was no breach of the warranty of *American* property ; and that the insured were entitled to recover for a total loss. The insured was not bound to disclose to the insurer that such a paper was on board ; it being a paper in the usual course of trade ; and it is always open to inquiry how far a paper, though intentionally *false*, was material to the risk. The amount of loss in this case, was held to be the *prime cost* of the hides, or 10 cents per pound and the charges thereon.

*It seems*, that in estimating a total loss on an open policy of insurance, the value of the goods at the outset or commencement of the risk, with the usual charges, is what the insurer ought to pay; and that the *prime cost* is generally the safest and best rule of ascertaining such value ; especially where the goods are purchased for exportation.

*York* only; and in case of capture or detention, not to abandon in less than four months, after advice thereof, or until after condemnation;" and also warranted " that the property thereby insured was not imported by the exporters." The sum subscribed was 15,000 dollars.

The plaintiffs were *American* citizens, and sole owners of 5,839 hides, weighing 178,862 pounds, shipped on board of the *Minerva*, and were not the importers of them. The price paid for the hides, by the plaintiffs, was 10 cents per pound, the whole cost amounting to 18,064 dollars and 42 cents, exclusive of charges of interest or commissions, or premium of insurance.

The *Minerva* sailed from *New-York*, on the 30th of *July*, 1807, on the voyage insured, and on the 1st of *September*, 1807, was captured by a *British* privateer, and carried into *Plymouth*, and on the 27th *September*, 1807, the hides were condemned by the high court of admiralty in *England*, " as belonging to the enemies of *Great Britain*, or otherwise subject and liable to confiscation."

At the time the *hides* were shipped at *New-York*, by the plaintiffs, they were accompanied with a paper called a *certificate of origin*, and another paper called a *certificate of importation*. The former was dated the 28th of *July*, 1807, signed by the *French* consul, or commissary of commercial relations at *New-York*, under the seal of the commissariat, which certified, that, " agreeably to the papers and other documents presented to us, by Mr. *William Bayard*," (one of the plaintiffs, of the house of Le Roy, *Bayard* & *M'Evers*,) " merchant, of the city of *New-York*, the 5,839 hides, by him laden on board of the ship *Minerva*, Captain *Caldwell*, under destination for *Amsterdam*, were purchased and exported from *Montevideo*, prior to the capture of that place by the *English*."

This *certificate of origin* was a usual and customary

document on board of vessels bound from the *United States* to *France* and *Holland*, and by the decrees of those countries it was required that a certificate should accompany all goods exported in such vessels to *France* and *Holland*, certifying, that such goods neither came from *England*, nor her colonies, nor belonged to *English* commerce, in order to insure the entry of such goods in the ports of *France* or *Holland*, pursuant to such decrees.

The certificate of importation was as follows:

" Port of *New-York*, district of *New-York: These are* to certify, that in the *ship American Eagle, King*, master, from *Montevideo*, were imported on the 8th of *June*, 1807, 5,839 *hides*, consigned to *J. Clason and J. R. Livingston*, and for which the duties have been *landed*, according to law. Given, &c. the 28*th July*, 1807."

The words in *italics* were written, the rest being printed. In making out the certificate, the clerk at the custom-house, through mistake or inadvertence, omitted to erase the printed word " for," and the words " the duties;" hides being a raw material, on which no duties are payable by law; and if those words had been obliterated, (as they ought to have been,) the remaining words would have stated the simple fact, that " the hides had been landed, according to law."

These two documents were found on board the *Minerva* at the time of her capture, and were exhibited in proof by the captors, on the trial, in the court of admiralty. The sentence of the court of admiralty, as pronounced by Sir *William Scott*, was set forth in the special verdict; and the hides were condemned, on the ground of a continuity of voyage, from a colony of the enemy of *Great Britain* to the mother country of such colony, or its allies, and the documents above mentioned were among the proofs on which the decree of condemnation was founded.

The insured abandoned for a total loss, on the 26th.

of *November*, 1807, and exhibited to the defendants the usual preliminary proofs, and demanded payment.

The hides, at the time of their shipment, and before making the insurance, were invoiced at the price of *twelve cents* per pound, being the value thereof, exclusive of charges. The hides were purchased by the plaintiffs in *June*, 1807, of the original importers, with the intention of exporting them to *Europe;* and *Bayard*, one of the plaintiffs, was informed, at the time of the purchase, by *J. Clason* and *J. R. Livingston*, the importers, or one of them, that the hides were purchased by their agent at *Montevideo*, in *June*, 1806, and had been actually laden on board of the ship called the *American Eagle*, while *Montevideo* was in possession, and under the government of *Spain*, and that an export duty was paid on the hides to the officers of the government of *Spain*, at that place, and that the *American Eagle*, after the lading of her cargo, and payment of the duties, and being ready for sea, was prevented from sailing from *Montevideo*, on account of the place being invested by a *British* force, and did not sail from that place until after it was captured by the *British*, and was not permitted to clear out until after the payment of an additional export duty of *ten per cent.* on the cost of the hides and the residue of the cargo, and which duty was paid by the consignee to the officers of the *British* government there, on which they granted a clearance for *New-York.*

The *American Eagle* sailed from *Montevideo* in *April*, 1807, and arrived in *New-York* in the month of *June* following; and in consequence of the quarantine laws, then in force, she was not permitted to go up to the city, as no hides are permitted to be landed within the city between the 1st of *June* and the 1st of *November*, in any year; but they might be landed at any other place, within the district of *New-York*, during that period.

There being no private warehouses at the quarantine ground, it is usual, in cases where vessels cannot pro-

ceed to the city by reason of the quarantine laws, for the collector of the port to suffer such cargo to remain on board the vessel for a reasonable time, to give the importer an opportunity to sell and dispose of the same, before it is actually landed; such cargo, however, being first duly entered at the custom-house, and, if subject to duty, the duties being first duly paid or secured according to law. The hides in question, on the arrival of the *American Eagle*, were duly entered at the custom-house, and as no duty was payable on them, by the laws of the *United States*, they were not, for the reasons above stated, actually landed, but after the purchase of them by the plaintiffs, were transhipped, at the quarantine ground, within the port of *New-York*, from the *American Eagle* to the *Minerva;* and such transhipment, under the circumstances above mentioned, is considered by the officers of the customs in the port of *New-York*, and by the usage of the merchants of the said city, as equivalent to an actual landing of the property, previous to its exportation.

In case the court should be of opinion that the plaintiffs were entitled to recover for a total loss of the hides, and at the invoice and value thereof, at the time of the shipment thereof, and before the making the said insurance, together with the usual and just charges, the jury, by their special verdict, assessed the damages at 13,443 dollars and 42 cents.

But if the court should be of opinion that the plaintiffs were not entitled to recover for a total toss, but only at the rate of the actual cost, or price paid by the plaintiffs for the hides, together with the usual and just charges; then the jury assessed the damages at 11,376 dollars and 85 cents. And in case the court should be of opinion that the plaintiffs were only entitled to recover for a return of premium, then the jurors assessed the damages at 1,010 dollars and 41 cents.

*David A. Ogden*, for the plaintiffs. From the facts stated in the special verdict, the plaintiffs are entitled to recover for a total loss. All the warranties contained in the policy have been fulfilled; and the only question which can arise is as to the amount of damages; whether they are to be estimated according to the original cost, or the invoice price and value at the time of the shipment. The true rule is, the value of the subject at the time of the shipment; and the cost is only a means of ascertaining the value. The first price of a thing does not always afford a certain criterion of its true value; for it may have been purchased very dear or very cheap.[*] In *Lewis* v. *Rucker*,[†] Lord *Mansfield* said, the insurer "must pay the prime cost, that is, the value of the thing insured, at the *outset.*" In *Steevens* v. *The Columbian Insurance Company*,[‡] the court said, "that in an open policy on goods, the rule by which to estimate a total loss, was the *invoice* price, and all duties and expenses, till they are put on board, with the premium of insurance; that in an open policy on the vessel, her value at the time she sails, with the expense of her outfit and premium, was the rule by which to estimate a total loss." In *Gahn and Mumford* v. *Broome*,[§] it was laid down as a general rule, that in an open policy, the *invoice price* is the value which, upon a total loss, the insured is entitled to recover. All the books speak of the invoice price, that is, the value at the outset, or at the time of shipment.

*Hoffman* and *Harison*, contra. We do not mean to defend the decision of Sir *William Scott*, as to the ground of a continuity of voyage; but we shall contend that the plaintiffs are not entitled to recover for a total loss, for another reason. The plaintiffs put on board a *false* paper, the certificate of the *French* consul, which was the real cause of condemnation. This certificate declares, that the hides were purchased and exported from

[*] *Marshall on Ins.* 621.
[†] *2 Burr.* 1167. *Park,* 1170. 132.
[‡] *3 Caines,* 43.
[§] *2 Johns. Cas.* 47.

*Montevideo*, prior to the capture by the *British*. The special verdict states, that this was a usual and customary document; but because the decrees of *France* rendered such a document necessary, it does not follow that it should not contain the truth. Now it appears from the case, that the hides were not, in fact, exported from *Montevideo*, until after the *British* were in possession of the place. The object of the certificate was to secure an entry in *Amsterdam;* but though it might operate to protect the property against *France* or her allies, it increased the risk of capture from *British* cruisers. In the case of *Blagge* v. *The New-York Insurance Company*,* the court held, that under a warranty of neutral property, if there was any false paper, which increased the risk of belligerent capture, the insured could not recover. It was well known that the *British* courts condemned on the ground of a continuity of voyage; any paper, therefore, which would give colour for condemnation, is sufficient to discharge the insurer.

If the vessel was captured on account of this document, the insured cannot now be permitted to explain or contradict it. Such document by a foreign minister, must, as Sir *William Scott* observed, be conclusive evidence of the fact which it states. A neutral is bound to have true and authentic papers. If the real truth had appeared in this case to the court of admiralty, the condemnation would not have taken place. It was admitted, that if the goods had been shipped after the capture of *Montevideo* by the *British*, there would have been no continuity of voyage; but the certificate of the *French* consul was considered as decisive evidence to the contrary.

2. Some general rule must be established, by which to ascertain the amount of loss. The prime cost is a fixed measure of damages; but if the value at the time of subscribing the policy, or the shipment, is to be the guide, it will alway fluctuate with the rise and fall of the

ALBANY,
Feb. 1811.

LE ROY
v.
UNIT. INS. Co.

* 1 *Caines*, 549.

market. ' If the insured gets the cost of the goods, and all charges, he is completely indemnified. The *prime' cost* and the *value* are the same; and when the books speak of the prime cost, or *invoice* price, they mean the invoice of the cost of the goods, not the invoice made up by the shipper, with a view to exportation. But in this case, the goods were purchased with a view to an immediate exportation, and not for the purpose of a sale here. This is a strong reason for considering the cost as the value of the goods.

3. If the certificate, being a *false* paper, ought not to have been on board, the plaintiffs are not entitled to a return of premium, for the defendants have run the risks prior to the capture; and if they have run any part of the risk, there can be no return of premium. Again, the policy was dated the 7th *July*, when the goods were shipped, and the certificate is dated the 25th *July;* from the 7th to the 25th *July*, therefore, the goods were at the risk of the defendants in the port of *New-York.*

*T. A. Emmet*, in reply. 1. The goods were purchased when *Montevideo* was a *Spanish* colony; they were shipped and ready for sea, and had paid the *export* duty to the *Spanish* government. They had acquired all the rights and privileges of neutral property, when the *British* came. They then paid the *British export* duty. They had, therefore, a double right to be respected; by *Spain* or her allies, for having paid a *Spanish* duty; by *Great Britain*, for having paid the *British* duty. If there is any falsehood in the certificate, it is of the slightest kind; but in every just and liberal sense it is true. According to the reasoning of the defendants, because the plaintiffs have paid duties to both nations, in order to protect the goods against both, they are for that reason liable to be condemned by both. The property was *bona fide American*, and was not exported by the importer. The proof of the neutral property

could be made in *New-York;* and the performance of the warranties has been found by the special verdict.

It is true, that where there is a warranty of neutral property, unneutral papers must not be on board. It is not every false paper that will amount to a breach of the warranty; but it must be an unneutral paper. Is this certificate of origin, then, an unneutral paper? Whether true or false, does it affect the fact of the neutrality of the property? The objection, then, of its being false, fails, *in limine.* It can only affect the question as to the continuity of the voyage; but this country has never acknowledged the *British* rule, or the rule of 1756, on this subject.

Again, it is found to be a usual and customary document, for all *American* vessels bound to *France* or *Holland.* The defendants must have known, as the insurance was to *Amsterdam,* that such a paper would be on board. The insurers are bound to know the usage and course of trade.* In *Planche* v. *Fletcher,†* Lord *Mansfield* said, that the practice of taking *Ostend* papers, being the course of trade, was to be deemed to be known to every body. The defendants then knew that there would be a certificate of origin on board, and, on the ground now contended for, with the risk of certain condemnation by the *British.* How then can it be said, that the risk has been increased? If there had been no certificate of origin on board, and the property had been condemned by a *French* court for that reason, the defendants would have refused to pay, because a usual and necessary document was not on board.

* *Park,* 251.
*Marshall,* 574.
1 *Burr.* 341.
350.
† *Doug.* 251.

2. The value at the *outset,* or the commencement of the voyage, is the true value. The insured, in case of loss, is to be put in the situation he was in at the time the risk or voyage commenced. If goods are given by a father to his son, to set him up in trade, and he exports them, is the insurer to pay nothing, because the goods cost the insured nothing? *Prime* cost is synonymous

CASES IN THE SUPREME COURT

with *value at the outset.* *Marshall* says, the *prime cost* or *invoice* price. The invoice is a fair document of trade, made by the merchant, at the time of shipment; and is for the information of the consignee or merchant abroad, as to the value of the goods at the port of shipment, and is a guide as to profit in the port of destination. The invoice, which makes a part of the preliminary proof, is the invoice of shipment. Prime cost is the value or cost at the port of shipment, as distinguished from the value at the port of delivery, where the expenses and profits are added.

3. The insurance must be on all the risks or none. There can be no apportionment of the risk. It does not appear from the verdict when the goods were shipped.

THOMPSON, J. delivered the opinion of the court. The objection raised by the defendants' counsel, against a recovery as for a total loss, is, that the vessel had on board a certificate of origin from the *French* consul, and that the defendants were not informed of this document. It is said to have been a false paper, and the efficient cause of the condemnation.

The *French* consul certifies, that agreeably to the papers and documents, presented to him by *William Bayard,* the hides in question were purchased and exported from *Montevideo,* prior to the capture of that place by the *English.* And, according to the finding of the jury, the purchase of the hides, the lading them on board, and the payment of the export duties, all happened while *Montevideo* was in possession of the *Spaniards;* and these were the most essential acts in the process of exportation, as far as related to the belligerent policy, on the subject of such colonial trade. It may, therefore, be questionable, whether this certificate of origin ought to be considered as false. But admitting it not to be strictly true, there was no evidence of any *mala fides* in the plaintiffs. The jury have not found any fraud in

them, in respect to the contents or concealment of the paper. Independent, however, of these considerations, a conclusive answer to the objection is, that it is found by the jury that such a certificate was a *usual and customary document* on board of *American* vessels, bound to *France* and *Holland;* and one required by decrees of those countries to insure an entry. It was, then, a paper not necessary to have been formally disclosed, because the insurer must have known it would be on board. It is not to be supposed they were ignorant of this course, and of this necessity. The assured may be innocently silent as to those things which the underwriter ought to know. (*Park*, 183.) The insurer, in estimating the price at which he is willing to take the risk, must have under his consideration, the nature of the voyage to be performed, and the usual course and manner of conducting it. Every thing done in the usual course is presumed to have been foreseen, and in contemplation, at the time he engaged. He takes the risk upon a supposition that what is usual and necessary will be done. (1 *Burr.* 348.) The underwriters are chargeable with the knowledge of this document being on board, and so took the risk of the consequences of it upon themselves. If this document exposed the subject to loss, by means of one belligerent, the want of it would equally have exposed the property to loss from another. It is always a question how far the want of disclosure of a paper, admitting it to be intentionally a false one, was material to the risk. This was the doctrine in *Barnwell* v. *Church.* (1 *Caines' Rep.* 217.) It is a well settled rule, in the law of insurance, that matters which are presumed to lie equally in the knowledge of both parties need not be disclosed. (3 *Burr.* 1605. *Doug.* 238. and *Mayne* v. *Walter*, *Park*, 196.) There was no breach of warranty in the present case. The plaintiff did not undertake to warrant against the consequences of the importation of

ALBANY,
Feb. 1811.

LE ROY
v
UNIT. INS. Co.

the hides from *Montevideo*, any further than that they themselves were not the importers. We cannot, therefore, see any substantial objection to a recovery for a total loss. And the remaining question is, upon what principles shall the loss be computed?

In the case of *Mumford* v. *Broome*, (1 *Johns. Cas.* 120.) decided in this court, it is said to be a settled rule, that in an open policy on goods, the invoice price is the value which, upon a total loss, the insured is entitled to recover. That this affords not only an equitable but a certain rule, not influenced by the *fluctuations of value* which subsequent circumstances may produce. The invoice price, as here understood, is evidently the prime cost, this being a fixed and certain criterion, which is the reason assigned for the rule. And besides, it appears from the case, that at the time of effecting the insurance, an account stating the price at which the goods had been *purchased*, was exhibited to the underwriters, for the purpose of showing the interest intended to be insured. Although an invoice, strictly speaking, may be a document transmitted from the shipper to his factor or consignee, containing the particulars and prices of the goods shipped; and when understood in this sense, and made out without regard to the prime cost of the articles, it might be objectionable as a rule of evidence by which to estimate the value of the subject; yet invoice is sometimes used and understood, as containing an account of the prime cost of the articles specified. Thus, in *Marshall* it is said, the loss is estimated according to the *prime cost*, that is, the *invoice price*. And in *Magens* (vol. 1. p. 37.) it is laid down, that the *invoice of the cost* is the rule by which the loss is to be computed. (*Burns, on Ins.* 158.) It is, in the opinion of the court, unnecessary here to establish any general rule on the subject. Whatever the rule ought to be, we think, in the case before us, in computing the loss, the hides must be estimated at ten cents per pound, that being the prime cost. And

it is peculiarly fit and reasonable to adopt this as the price here, because it will be a complete indemnity to the assured, and as the hides were not only purchased for the express purpose of exportation, but never were landed, being purchased and transhipped at the quarantine ground. An inquiry into their real value, or market price, must, therefore, be attended with some degree of uncertainty. The prime cost of the goods might not, in many cases, be a just rule of computation, as where they were not purchased with a view to an immediate exportation, and had remained on hand for a considerable length of time. But in matters of commerce, the plainest and simplest rules are always the best. And I should incline to think that, generally speaking, the prime cost would be the best rule by which to test the value of the subject. The prime cost is commonly the market price of the article. And as the shipment, in the usual course of business, is made soon after the purchase, the prime cost is, ordinarily, the real value of the subject. In a valued policy, the value inserted is always understood to be the fair amount of the prime cost of the goods. When the insurance is, *bona fide*, meant as an indemnity, it must be taken that the value was so fixed as that the insured might, in case of loss, have an indemnity and no more. (*Condy's Marsh.* 288, 289.)

In the case of *Lewis* v. *Rucker*, (2 *Burr.* 1167.) Lord *Mansfield* seems to consider prime cost and value in the policy as importing the same thing. He says, that in case of a total loss, the prime cost of the property insured, or the value mentioned in the policy, must be paid by the underwriter. And again, the *prime cost*, that is, the *value* of the thing insured at the *outset*, is what the underwriter has to pay. (*Marshall*, 288, 289.) There seems to be no good reason why the same rule should not prevail, in computing the loss on an open policy ; and that the value of the goods, at the outset, or commencement of the risk, together with the customary

charges, should not be the sum the underwriter ought to pay. It becomes, then, in a great measure, a question as to the rule of evidence by which this is to be ascertained. And the prime cost, especially where the goods are purchased for exportation, appears to me to be the plainest and simplest rule, and less exceptionable than an inquiry into the market price of the articles. This is fluctuating, and always more or less uncertain. The former rule will always indemnify the assured; and the result of an inquiry, according to the latter, will depend upon the opinion of a jury, formed, perhaps, from the clashing testimony of witnesses.

Without intending, however, to lay down any general rule, we adopt prime cost as the principle upon which, in this case, the loss must be computed, and according to which, by the verdict of the jury, the plaintiff is entitled to judgment for 11,376 dollars and 85 cents.

Judgment accordingly.