By the Court.—Sedgwick, J.
The insurance in this case, was made by a valued policy. The policy contains the clause, “the said goods and merchandise-hereby insured are valued at two hundred and thirteen thousand dollars.”
The valuation of a policy is deemed to be the result of an agreement between the insurer and insured, which liquidates the amount of the indemnity, which the insured is entitled to have, in case of loss. This agreement may be invalidated by the insurer, if his assent be procured, by material misrepresentation, fraudulently made. It is unnecessary to determine on this appeal that it may be avoided by anything less.' The answer substantially avers that the insured acted fraudulently in procuring the valuation in the policy.
It appeared that the policy was issued upon an application made by the insured, through his broker, to-which the insurer had assented. By the terms of the-application, the insurance was to be “on military goods and merchandise, valued at invoice and five percent. unless otherwise agreed.” This clearly provided that at all events the policy was to be valued, but the-amount of the valuation was not specified. The amount, was either to be the subject of a future agreement, orín case such agreement was not made, the amount was^ to be “invoice and five per cent.”
After this application was made and agreed to, the-plaintiff instructed his broker to have the valuation-made at two hundred and thirteen thousand dollars.. The broker testified that he went to defendant’s attorneys and asked them “to fix the permanent valuation,”' *341 :and gave the figures two hundred and thirteen thousand •dollars. It would appear that this was done for the purpose of having the policy immediately thereafter issued. The broker took the application, and making a line with the pen through the words “ invoice and five percent, unless otherwise agreed,” wrote above them “$213,000.” Nothing further was said according to a construction of the testimony most favorable to the plaintiff. The policy was then made out in its present form.
Without now adverting to considerations peculiar to •contracts of insurance, it appears to me a correct position, that the facts that have been stated, leave -doubtful whether the amount named as the proposed permanent valuation by the broker, was proposed as :the amount of ‘£ invoice and five per cent.,” and as such agreed to by the insured, or was proposed to fix the ■valuation independent of what in fact was the amount of “invoice and five per cent.,” but under the phrase of the application “ unless otherwise agreed.” In naming two hundred and thirteen thousand dollars the broker had acted as he was instructed by the plaintiff. In -these instructions the plaintiff had said nothing as to .the mode in which the valuation was to be made. The broker had said nothing on that subject in his interview with the witness. Apart from naming a sum as permanent valuation nothing was said which indicated that an agreement was about to be made independent of “ invoice and five per cent.” If the parties intended to insert the amount of “invoice and five per cent.” in the policy as the value, a sum for that purpose would have to be named, or at least it was appropriate and usual that it should be named. Therefore, the naming of the sum only, as the amount of permanent valuation, is not decisive evidence of the intention •of the parties. Although the broker struck out of the application “invoice and five per cent, unless otherwise *342 agreed upon,” that was not done to make a néw and.' independent contract, but was under the application as. it was made at first. At any rate, this is not certain one way or the other, as a matter of law.
The defendant had a right to take the verdict of the jury as to which was the correct construction of the-evidence, and to urge that as matter of fact the naming of two hundred and thirteen thousand dollars was-under the provision that the value was to be “invoice- and five per cent.” and was a representation, therefore, that that amount was “invoice andfive per cent.”(Simar v. Canaday, 53 N. Y. 298). If this representation was-untrue to the knowledge of the plaintiff, and the defendant acted upon it, the valuation was not binding-upon the defendant.
It was necessary to inquire what did .“ invoice and. five per cent.” mean. Literally it means, after supplying the word price or cost as understood, the amount: stated as price or cost in the invoice of the goods, and would imply the existence of a paper properly called an invoice. The word is used, however, to denote-other meanings. As is often the case in the use of words, the word invoice is sometimes used to designate things of which it is the frequent accompaniment or-evidence. An invoice accompanies goods, and states price or cost. Consequently an invoice of goods sometimes means the goods themselves, and invoice price or-cost sometimes means the prime price or cost of goods, although there is no invoice in fact. On the trial, therefore, the defendant had a right to show in what particular manner those words were used in the business of underwriting (1 Greenl. Ev. § 292, and note 8). They were employed in a transaction between an insurer and an insurance broker. The defendant, on the trial, put. questions to the witnesses on the subject, for the purpose of proving, as was stated, that the words meant. *343 among insurers first cost or prime cost, irrespective of the existence of an invoice.
If these views are sound, we are obliged to sustain two exceptions upon the trial taken by the appellants. The first was to overruling the question put by defendant’s counsel to the attorney of defendant in his insurance business. “State what, in the usage of underwriters, is the meaning of the term ‘ invoice cost and five per cent, added.’ ” The second was to overruling the question put by defendant’s counsel to the-plaintiff, when a witness. “ The $213,000 was intended by you, in the making of the insurance, to be what was first stated in their application as invoice cost, was it not, and five per cent, added ?” The plaintiff had instructed his broker to have the permanent valuation fixed at two hundred and thirteen thousand dollars. If the broker, although unwittingly, had that done as ' stating the invoice or prime cost, the plaintiff’s design or purpose to cause him to do it was relevant to the-claim made by the defendant: 1st, that the sum was fixed at invoice or first cost; 2nd, that this was intentional and tended with other facts to show a fraud in the valuation.
There were other exceptions, that relate to attempts on the trial, by the defendant, to give evidence as to fraudulent overvaluation. The subjects of insurance were military goods, so-called, viz.: muskets, sabres, knapsacks, haversacks, pistols, shot, ammunition and infantry accouterments. The plaintiff had procured, them in 1867. By the testimony these did not have a market value. Our government was the principal source of supply. It would seem that they were such as were on hand at the end of the rebellion. The business was not of a kind that led to general competition. Prices given or demanded, depended upon the circumstances peculiar to the single instances of the sales and. purchasers. In such case value is to be ascertained by *344 reference to the probabilities of the case (Sedgw. on Dam. 5 ed., p. 310, note 1), founded upon proof of facts, which in the ordinary transaction, of business, would affect the mind of a dealer in similar articles, in determining a price to be asked or given. And if the opinion of a witness, familiar with the market, can be given as to market value, it should seem clear that a dealer in articles that have no market value, can give his opinion as to value. Hot only would the jury have 'the facts which they should consider in determining value, but the aid of a skilled person in combining the isolated facts and in applying them practically to the point of inquiry.
A witness whose firm dealt in the kind of articles insured, which firm had sold a part of the goods insured to the plaintiff, amounting to thirty-nine thousand dollars ■ of the valuation, was asked by defendants’ counsel on cross-examination, “Did you not, because you took bonds in payment, charge forty per cent, more for those goods than their cash value, on that account ? ’ ’ An ob - jection to this question was sustained. This in effect called for the opinion of the witness, as to what was the cash value of the articles. The tendency of the question to elicit this, was not lessened, because the question suggested that the reason for charging forty per cent, more was that payment was to be made in bonds. If the witness had answered yes, the rest was matter of figuring. On cross-examination, the form of the question was not objectionable. In the absence of a market value, the cash value as called for from the witness was competent on the question of values, and the inquiry as to value was relevant to the defense of overvaluation fraudulently procured.
One of the facts the jury may consider in estimating - the value of articles that have no market value, is the cost of it to the party claiming the value/ Where a party to an action has given a price for goods, it is *345 in the nature of an admission by him, as to its value.
In Smith v. Griffith (3 Hill, 338), Nelson, Ch. J., said, “Though the price paid by the plaintiff was not conclusive upon him, as he might have been fortunate enough to buy under the fair market value, yet it was some evidence of that market value, and might well have been taken into the account with the other testimony.” Judge Co wen said, “ The plaintiff was a party to the price, and virtually conceded that the net value of the trees was no more than he gave. It should have been received as high evidence, that they were really worth no more in New York” (Wells v. Kelsey, 38 Barb. 242, approved on that point in 37 N. Y. 143). Even on the question of market value, much more in the absence of a market value, was the cost of the goods insured to the plaintiff, evidence against him, of value.
On the trial, it appeared from a statement made by the plaintiff, of the first cost, that of the total first cost one hundred and ninety-four thousand seven hundred and ninety dollars, a part—one hundred and five thousand one hundred and eighty-two dollars—had been bought for bonds at sixty cents on the dollar. Thus the cost to the plaintiff, was not any number of dollars, but a number of Mexican bonds. In order that the jury might make a use of this relevant fact, it was necessary that the value of these bonds should appear in testimony, in the currency of this country. In this way alone could they compare this species of evidence as to value with the valuation of the policy, to determine whether there had been a misrepresentation as to invoice cost, if the valuation was intended to be that, or a gross overvaluation, if the plantiffs position was correct, that the valuation was made independent of invoice cost. Gross overvaluation was properly to be weighed on the issue of fraudulent overvaluation.
The plaintiff, being a witness in his own behalf, was *346 asked on cross-examination by defendant’s counsel,. “Did you estimate a Mexican bond to be worth sixty cents on the dollar at that time?” Other questions were asked, tending to draw from him what was his estimate of the value of Mexican bonds. These were objected to, and were overruled on the ground that they did not tend to show the market value of the insured merchandise. It had appeared that the Mexican bonds had no market value, and that the witness was an agent of the Mexican government, had dealt largely in the bonds, and was acquainted with the facts that determined the actual value of the bonds. The plaintiff’s statement of the cost being evidence against himself of value, his belief or opinion, as to the value of Mexican bonds, was at least evidence of the quo animo he made the valuation at two hundred and thirteen thousand dollars through his broker. It was relevant to the issue of fraudulent valuation. I therefore think that the exceptions to the ruling upon questions of this class must be sustained.
While the plaintiff was under cross-examination a pamphlet was shown to him by defendant’s counsel, entitled “The Republic of Mexico and its American Creditors,” by Herman Sturm. The defendant’s counsel offered to read in evidence all the parts of this book that related to the value of Mexican bonds in 1867. The plaintiff’s counsel stated he had no objection to the book coming in evidence, but objected to parts of it being put in, and the court excluded the evidence offered, unless the whole book was put in evidence. The subject of the value of the bonds, and the plaintiff’s estimate of that value, was, as we have seen, material. It did not appear, and there was no presumption, that the other parts of the book, not offered by defendant’s counsel, referred to anything relevant to the issue. The defendant’s counsel ■ therefore offered all of the book presumptively that properly could be admitted. *347 In Rouse v. Whited (25 N. Y. 173), it was considered as undisputed that a party has not a right to prove all that he said at the same time or in the same conversation (the other side having given part of what he said), solely because the further or other statements were made at the same time or in the same conversation. The rule was approved that when part of a conversation has been given in evidence, any other or further part might be given, which would in any way explain or qualify the part first given (Garey v. Nicholson, 24 Wend. 353). If the defendant’s counsel had offered, what then appeared to be but a part of the declarations as to the value of the bonds, the plaintiff might have successfully objected that all that related to it should primarily be given in evidence ; but it was sought to force the defendant to offer in evidence, parts of the book, that did not appear to be relevant. I am of opinion, that the exceptions taken on this subject should be sustained. Of course, the times referred to should not be remote from the time of the transaction investigated.
Apparently, from the printed case, the plaintiff took the position that for the purpose of determining whether or not there had been a fraudulent overvaluation the value stated in the policy was to be compared with the market value. I think the testimony clearly showed there was no market value, so that the plaintiff’s position must be changed to a comparison with actual value at time of shipment. I think, however, that the comparison should be, between the value stated in the policy and what the plaintiff could in a proper case have recovered upon an open policy. It perhaps may not be an universal and absolute rule in this State that upon an open policy, the insured shall only recover the invoice cost or prime cost (which in Leroy v. United Ins. Co., 7 Johns. 343, are deemed to be equivalent), besides the proper expenses, but there *348 seems to be no doubt that the invoice cost or prime cost is prima facie evidence of the market value or real value (Grahn v. Broom, 1 Johns. Cas. 120; Suydam v. Marine Ins. Co., 1 Johns. 181; Leroy v. United Ins. Co., 7 Id. 343; 1 Pars. Mar. Ins. 246, 247, 248, and notes). For this reason, the question made upon the trial as to fraudulent overvaluation, materially involved what the actual cost was to the plaintiff, even upon the basis that the valuation was not upon invoice cost and five per cent., but upon a general agreement irrespective of that.
Upon the general proof that, for the most part, the dealers in the kind of goods insured were furnished by the government at auction sales, I think it was competent to show what prices were given at those auction sales for goods of the same character as those insured, and for this purpose to designate them by the names given to them in the evidence from plaintiff or in his statement to the insurance companies. The “average prices ” were asked for. A particular objection would have required that this form be changed to inquire for the details of the prices. The defendant called for the average prices during the years from 1866 to 1868. I think he was properly limited to the year 1867, in which the sales to plaintiff were made. If there were any special reasons that justified the defendant in asking as to the years 1866 and 1868, they should have been shown in the first place.
The defendant’s counsel asked of defendant’s agent in making the insurance, “Would you have taken this risk, at the amount and valuation at which it was taken, if you had known that valuation was based in part on Mexican bonds ?” This would have called out a reflection of the witness upon a supposed state of facts. It did not ask for the actual effect on his mind of what was said by plaintiff ’ s broker. It was properly overruled (Newell v. Doty, 33 N. Y. 83).
*349 The receipts for the cargo by the mate, were allow ed in evidence by the court, who limited their effect to tending to prove the fact of shipment of somethirg, but not of what was shipped. There was in this nothing that may be successfully excepted to by the defendant.
For the reasons stated, I am of opinion that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event. And also, that the motion for a new trial made upon the minutes of the judge, should have been granted, and that the order denying that motion should be reversed, with costs to appellant to abide the event.
Van Vorst and Speir, JJ., concurred.