By the Court.—Speir, J.
The company sets up in the answer that Herman Sturm, at the time he applied for the policy, made representations as to the value and character of the cargo, which were false and fraudulent, to induce the company to make the insurance, and that the policy was issued by it on the strength of such representations. That the valuation of said goods made by Sturm or his agents were ficti-, ■tious and .excessive, and that the. representations as to *355 the prices paid by him for said goods, referred to pretended sales at nominally fictitious and illusory prices.
Other questions raised by the pleadings were discussed at length on the argument which I do not propose to examine, as I am forced to the conclusion that the question whether the company is entitled to a new trial, must turn upon the averments of fraudulent representations, in the inception of the contract in making false statements as to the character and value of the cargo. That issue was directly presented to the court and becomes the primary and most important subject of investigation, lying at the foundation of the plaintiff’s right to recover under his contract of insurance. The application as presented and accepted was made on August 30, 1867, by Johnson & Higgins, as agents of Herman Sturm, on account of whom it may concern ; loss, if any, payable to him, for fifteen thousand dollars, on military goods and merchandise “ valued at invoice and 5 per cent., unless otherwise agreed.” The application was accepted and the policy was made out and dated on September 5, 1867. Subsequently on September 23, upon the request of Sturm’s agent and with the assent of the company the words in the policy “ Invoice and>jive per cent, unless otherwise agreed ’ ’ which then stood in the application were erased, and instead thereof the words and figures 11 at $213,000” inserted, so that the application after such erasure and interlineation read “valued at $213,000 ” instead of * ‘ valued at invoice and 5 per cent, unless -otherwise agreed.”
The Orient Mutual Insurance Company then proceeded to show the purpose of making this alteration. The vice-president whose signature was attached to the application stated on his examination “ That the basis on which he took the original contract as to value was invoice and five per cent.,” and “ That the policy was made out as the application read originally, that is *356 '■Invoice and 5 per cent? and that was subsequently-altered so as to ascertain what this invoice and 5 percent. meant in money.”
Thus far it does not appear that any objection was; made to this testimony, and I think it was proper. It is a statement of object of the change made in the-application and in the policy, and the character of the-contract entered into by the company. If the insurer-permitted the alteration to be made in the policy as-fixing the value of the invoice with the five per cent, added in money, and believed and understood that it was what Sturm’s agent asked for, and if the plaintiff’s-agent intended to effect a change in the contract under the phrase “unless otherwise agreed,” and meant that the sum of two hundred and thirteen thousand dollars was the absolute value irrespective of invoice price, it seems to me an important question is presented which should be determined by the jury. A valued policy is defined to be “the agreed estimate and valuation which the parties have agreed upon as the value of the property.” As the case then stood at the trial, the estimate and valuation of the property to be insured had not been agreed upon by the parties, and the contract can not be enforced unless the minds of both have assented to its terms.
After the question “what is the meaning of the words invoice and jive per cent, as understood by underwriters,” had been ruled out by the court; the attention of the witness was recalled to the original application and, to the policy by the counsel who offered to show “that the phrase Invoice and five per cent.” was but the general expression for the sum in figures, subsequently ascertained and presented by the assured, was a mere alternative expression to fix the amount of the words invoice and five per cent., and ascertain the exact amount, and the words “in *357 voice and five per cent, in the true meaning as used in the policy, refer to the actual cash value or cost price of the property in the port of New York.” This offer was rejected. Nor was the defendant permitted to show either what the words “ Invoice and five per cent.” meant in the application and policy by the universal custom of underwriters, experts and dealers in marine insurance, or that the figures two hundred and thirteen thousand dollars inserted in the policy on September 23,1867, were but the alternative and equivalent of the words “ Invoice and five per cent ,” thus making •definite and exact the same amount as indicated by invoice and five per cent.
To determine the propriety of this line of examination and the right of the defendant to the information •called for, reference should be had, I think, to the context of the subject-matter then before the court, and the circumstances under which the phrase was used. Nothing had taken place between the parties relating to the insurance applied for during the interval of about two weeks when the application was made and accepted on the basis claimed in it, up to the time the alteration relating to the value of the property was effected. Nor does it appear that any words passed between them on the subject, except the request and the assent. The policy had remained in the possession of the ■company executed and ready for delivery. The issue of a fraudulent representation of value in the inception of the contract, was directly presented to the court by the company for judicial examination, and the evidence ■offered unerringly pointed to it, and the question is, •could the court take from the jury the right to determine that issue. The officer acting for the company had accepted the terms proposed, and in confidence relying upon the risk taken under his already executed policy for goods valued at invoice and five per cent, might very well be thrown off his guard by the *358 unexpected substitution of a gross sum in place of a. valuation at invoice at five per cent. The circumstances may have had a direct tendency to entrap the-company into an unfortunate snare, laid for the unsuspecting underwriter when the application was first-made, to him. I say this may have been the fact. The rejection' of this proof closed the door against the-admission, on the part of the defendants, of evidence of a false representation as to the cost of the property upon which the risk was asked. It was claimed by the-plaintiff, and the court ruled that the change was not made for the purpose stated by the witness-who acted for the company, but was a valuation in. dependent and under the clause “unless otherwise-agreed.”
What then, in this connection, did the phrase. “ Invoice and five per cent.” mean ? The authorities, I. think, give a meaning to the word invoice, taken almost literally from its derivative origin. Thence the ■ value of the goods named in the invoice is the prime cost of the property at the port of shipment, and in commerce it is a written statement of merchandise-shipped or sent to a purchaser, consignee, factor, &c., with the prices or charges annexed. The word is also-often used among business men as the sum at which, the holder of goods estimates them to be worth to him,, including therein the original cost, advances in such original cost and charges. If the prime cost was what was understood, then the words “invoice and five percent.” would mean that the sum of two hundred and. thirteen thousand dollars was the amount of that prime-cost with five per cent, added. It would then be a. representation that the prime cost with five per cent, added was two hundred and thirteen thousand dollars, and the company could show that it was a fraudulent representation of the price and that they could. *359 only be liable for the actual cost of the goods, and five per cent, added to cover charges, freight, &c.
The defendants, therefore, had the right to show the-import of the phrase among underwriters, experts and dealers in marine insurance. The witness was shown to be an expert in marine insurance of long standing and in good repute. The phrase was used in a transaction between an insurer and the plaintiff’s agent, who made it his business to procure insurance for others.
The principle of admitting parol evidence in exposition of that which is written is that the court may be placed in regard to the surrounding circumstances as nearly as possible in the situation of the party whose written language is to be interpreted. The question is, what did the person thus circumstanced mean by the-language he has employed (1 Greenl. on Ev. § 295, a). In 1 Duer on Ins. 170, it is said “Upon an attentive examination of the cases in relation to other contracts as. well as that of insurance, we shall see no reason to doubt the truth that all indeterminate words in a policy for the same reason as the words ‘a,t’ and ‘freight’ may be properly explained and limited by parol evidence, when the nature of the evidence is to designate-with certainty the subject to which the parties intended to refer.”
The consideration of the question of false representation as to the value of the cargo so directly raised by the testimony before admitted without objection “that the alteration was made to ascertain what this invoice and five per cent, meant in money,” was wholly withdrawn from the jury, without ascertaining whether that testimony was true or false.
The plaintiff’s claim that neither in the application or policy as originally made, was there any representation that the amount insured was invoice and five per cent. ; that in both the cargo was valued at invoice and *360 five per cent, and that, therefore, there was in both a valuation of the property insured, but no representation of the amount. I am unable to see that this statement admitting its truth solves the difficulty, or presents an answer to the objection. Admitting that the cargo was valued at invoice and five per cent., the defendants’ position is that when the plaintiff fixes that value at •two hundred and thirteen thousand dollars, the amount is grossly overvalued, and that he can show the fraudulent representation by proving that the prime cost of the invoice with the five per cent, added, does not amount to more than twenty thousand dollars as set up in his answer. The objection tersely expressed is that fertile purpose of proving fraud, the ruling of the court .shuts the defense off from showing the amount of those .overcharges in the invoice which was the true measure .of the risk taken by the defendant, and not a valuation •independent of that measure. In what other way can the question of fraudulent representation be raised. •The facts proposed to be proven in this case, as will hereafter be seen, if admitted, would go to the jury, and it belongs to them to say whether they are sufficient to ..establish the defendants’ allegation of fraud or overvaluation, or not.
Had the plaintiff, in the first instance, applied for ■an insurance upon an agreed sum, and the policy had been strictly a “ valued policy,” I think the evidence should have been admitted. It will not be denied that in a valued policy a gross overvaluation of the property sought to be insured, could be shown by the defendants. To lay the foundation of this proof, they were entitled to show that the first representation was not modified by the second, but in effect made more explicit and definite, viz.: That by the change of ¡expressions, the representation was specific as to the ,cost of the goods with five per cent, added, and that the ¡same was actually two hundred and thirteen thousand *361 dollars. Judge Parsons says; “In a valued policy, the agreed valuation is final and conclusive upon both, parties, subject to certain rules and principles, among those if made fraudulent in any respect, and that though an overvaluation is not of itself necessarily proof of fraud, yet if gross and excessive, fraud may be inferred.” The defendants, therefore, were entitled to the evidence to show that by the usage or understanding of underwriters, the insertion of the sum of two hundred and thirteen thousand dollars in the policy in the place of “invoice and five per cent,” was a repetition of the original representations that the risk applied for was upon the cost of the property, bringing it within the principle that a valued policy is void if it is made fraudulently in any respect. In Lewis v. Rucker (2 Bur. 1171,) Lord Mansfield lays down, I think, the true principles on this subject. “The only effect of the valuation is fixing the amout of the prime cost, just as if the parties admitted it at the trial, but in every argument, and for every purpose it must be taken that the value was fixed in such a manner as that the insured meant only to have an indemnity. If it be undervalued, the merchant himself stands insurer for the surplus. If it be much overvalued, it must be done with a bad view ; with some view to a fraudulent loss” (Forbes v. Aspinwall, 13 East, 1811; Wolcott v. Eagle Ins. Co., 4 Pick. 431). These cases go to the point that the valuation in a policy is to fix by agreement between the parties an estimate upon the subject insured, •and to supersede the necessity of proving the actual value by specifying a sum as the amount of that value, and that in fixing the amount of that sum, if the assured keep fairly within the principle of insurance, which is merely to obtain an indemnity, he will never go beyond the first cost in the case of goods, adding thereto only the premium and commission. The summing up of the whole very clear and able opinion of Mr. Justice *362 Thompson, in Le Roy v. United States Insurance Co. (7 Johns., 343), is to the effect that when the representation is made upon the basis of cost, then the party is entitled to show in all cases what the actual cost was. He sáys “ this rule affords not only an equitable but a certain rule not influenced by the fluctuations of value which subsequent circumstances may produce. The invoice price as here understood, is evidently the prime cost, this being a fixed and certain criterion which is the reason assigned for the rule.”
If the foregoing views, relating to the peculiar circumstances under which this contract of insurance was made by the parties, be sound, it becomes important to examine some of the exceptions taken to the rulings on the trial, as the evidence offered was intended to show fraudulent overvaluation.
The plaintiff procured, in 1867, muskets, sabres, knapsacks, haversacks, pistols, shot, ammunition, and, infantry accoutrements, which were insured by him, and are set forth in the statement of cost of cargo of schooner “Samuel T. Keese,” in the case. These goods were in the possession of our government at the end of the civil war, and the government was glad to dispose of them to purchasers who desired this peculiar kind of goods. The character of the articles was such as to invite but little competition. It is quite evident from the case, that these military goods are exceptional, in not having any regular market value. Demand and prices are subject to the fluctuations always attending the peaceful or warlike condition of the country. The inquiry did not relate to single sales, but to average prices at auction sales, about the time the property was purchased. It will not be contended that, because there was no market value for those articles, the defendant should not be permitted to give the best evidence of value he could ; otherwise it wquld be impossible to interpose the defense of a fraudulent repre *363 sentation of value. The offer to show that the actual cost of these goods was different and less, and in some instances less by one-third than the prices charged in the “statement of cost” presented on the trial, was ruled out by the court. Nor was the defendant allowed to prove what was actually paid for a portion of the goods, or what goods of this description were actually selling for in the open market.
The question, “How much beyond their cash value did you charge, because you received bonds in payment at sixty cents on the dollar?” was objected to and sustained. The subject inquired about was a part of the invoice of the goods insured, and a part of those which were entered in a “statement of cost of cargo of schooner Samuel T. Keese” put in evidence. The object obviously sought was, to discover how much beyond the cash value the witness charged for the articles in the invoice sold by him to Sturm, in consideration of his receiving bonds in payment, at sixty cents on the dollar. The importance to the defendant, of this evidence, will appear by the item of ten thousand knapsacks, which the witness had sold Sturm on September 13, at three dollars and ten cents, for bonds at sixty cents,—carried out, thirty one thousand dollars. The plaintiff, Fuhke, testified that he sold Sturm ten thousand knapsacks on September 13, 1867, and they are charged, in the statement of cost, at three dollars and ten cents,—bonds at sixty cents,—thirty-one thousand dollars. The witness was asked: “What price did you receive for them?” This was not allowed. The offer was then made, as evidence of value, to prove that the witness paid for these knapsacks eighteen and three-quarter cents apiece, and not permitted. The witness, Sturm, had testified what this statement was. “It is a statement,” he says, “of the cargo of the Samuel T. Keese, and its cost to me, furnished by me to Mr. Hand, I believe, for the insurance *364 company.” He further says that the statement contains a list of goods purchased by him for the bonds of the Republic of Mexico, and they were taken by him at the rate of sixty cents on the dollar. The witness, Sturm, was the alleged owner of the cargo of the Keese, which he had represented to the underwriters to have cost two hundred and thirteen thousand dollars. He had testified, on the trial, that the actual cost of the cargo, as stated by him in his affidavit annexed to the statement of cost, was one hundred and ninety-four thousand dollars; and of this sum, over sixty per cenb had been purchased with Mexican bonds, at sixty cents on the dollar. The defendant offered to show, by Sturm himself, that this statement was fraudulent; and also, as impeaching his credit with the jury, that he had made public representations, at and prior to the time when he bought these goods, that the bonds were not only not worth sixty cents on the dollar, but had hardly any money value; that, under instructions from the Mexican government, he had to sell them at the nominal sum of sixty cents; and that he had published this in a pamphlet, and distributed the publication. This was not permitted.
The offer was also made to show by the witness Hartley, that in 1867, he sold military goods to Sturm, for Mexican bonds, which bonds he sold in the market at from eighteen to twenty-two cents on the dollar, having effected such sale before he established the price at which he sold the goods to General Sturm, and he also offered to show that the witness sold the Mexican bonds which he received from Sturm, in exchange for goods, at between eighteen and twenty-two cents on the dollar, in 1867, all of which wa,s not permitted. In 3 Phillips on Evidence, it is said “ In valued policies, if the loss bé total, the assured must only prove that his interest is not merely colorable. But where the property is greatly overvalued, the insurance will be wholly void.” *365 If the overvaluation be bona fide and innocent, the policy is good, if fraudulent, it is void.”
Applying the principles last cited in Phillips, it appearing that a chief part of the “invoice,” which the author speaks of as “prime cost,” is composed of goods not purchased for cash, but for something else stated at the time at four times its market value, does it not become pertinent and material evidence on the ground of gross overvaluation, leaving out of view in this connection the question of false representation % If then the evidence was material and competent, at least the question, whether the property was greatly overvalued, should have been left to the jury. I think the judgment should be reversed, and a new trial granted, with costs to the appellant, to abide the event.
It will follow from the conclusions we have announced that the motion for a new trial on the minutes should have been granted, and the order that was made, is reversed with costs, to appellant, to abide event.
Sedgwick and Van Yorst, JJ., concurred.