LARKIN COMPANY, Respondent, *v.* NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, Appellant.

(Supreme Court, Erie Special Term, January, 1917.)

Carriers — of merchandise — bills of lading — actions —evidence — meaning of "invoice price" — interstate commerce commission — when judgment in favor of plaintiff affirmed.

For the purpose of protecting parties against variations and fluctuations in value, the "uniform bill of lading," adopted by an agreement of the interstate commerce commission with the various common carriers of the country, provides that "The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading."

Where, in an action by a mail order company brought solely to recover the "invoice price, if any," for a loss of premium merchandise shipped over defendant's railroad, the contention of plaintiff that at the time of shipping all of its commodities, there is a definite cash price fixed by its catalogue, issued to the public, under which the customer makes his purchase,

fixed not only on the product sold but also on the premium merchandise, is sustained by the proof, and plaintiff and defendant having agreed that " invoice price " means the actual amount paid or agreed to be paid by the purchaser, there is an " invoice price " within the meaning of the uniform bill of lading upon the premium merchandise, and a judgment in favor of plaintiff will be affirmed.

APPEAL by defendant from a judgment of the City Court of Buffalo.

Thomas D. Powell, for appellant.

John Lord O'Brian, for respondent.

BISSELL, J. This action, which is in the nature of a test case to determine a large number of unpaid claims of a similar character, was brought to recover damages for the loss of premium merchandise shipped by the plaintiff over defendant's line of railroad.

There is no dispute as to the shipment or the loss of the merchandise.

The only question in dispute relates to the measure of damages, and involves an interpretation of the clause in the so-called " uniform bill of lading " adopted several years ago by an agreement of the interstate commerce commission with the various common carriers of the country, one of the conditions of which, for the purpose of protecting the parties against variations and fluctuations in value, fixes a special rule of damages, different from the common-law rule, and reads as follows: " The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (*being the bona fide invoice price, if any, to consignee,* including the freight charges, if prepaid) at the place and time of shipment under this bill of lading."

The action is brought solely to recover the "invoice price, if any" of the lost commodities; not to determine their value. The question therefore presented is, has the Larkin Company premium merchandise, as sold and shipped, a determinable "invoice price?" No formal invoice is used by the plaintiff company in making its shipments, and the defendant contends that the premium merchandise shipped by it with a purchase of its products is sent only as a premium or bonus with such purchase of products; that nothing is paid therefor; and that therefore it has no "invoice price" within the meaning of the clause of the bill of lading.

It is the contention of the plaintiff, on the other hand, that at the time of shipping all of its commodities there is a definite price fixed by the catalogue issued to the public, under which the customer makes his purchase, fixed not only on the products sold but also on the premium merchandise, and that there is therefore an "invoice price," within the meaning of the bill of lading, upon the premium merchandise.

The plaintiff conducts on a vast scale a mail order business of a peculiar character. It manufactures and sells its own products, and also furnishes certain merchandise as a bonus or premium with the purchase of its products; or it will sell such products and such merchandise separately. The customer uses a Larkin catalogue, which contains the offers of the plaintiff company as seller. The agreement of sale of the products and premiums is expressed in the catalogue, pursuant to which the offers are made and accepted by the purchaser. No formal invoices are necessary, because the business is a cash business. Articles of merchandise are shipped only upon receipt of the purchase price set forth in the catalogue. The purchaser orders commodities and premiums in accordance with the terms

set forth in the catalogue, and at the time of sending the order forwards a remittance to pay for his purchase at the price fixed by the catalogue.

" Invoice price " is the amount at which the goods are invoiced to the purchaser, the cost or value of the property at the shipping point. 23 Cyc. 352; *Pierce* v. *Southern Pac. Co.,* 47 Pac. Rep. 874, 877; *Le Roy* v. *United Ins. Co.,* 7 Johns. 343, 353.

The parties to this action agree that " the *bona fide* invoice price " as used in the bill of lading above quoted means the actual, true and honest amount paid, or agreed to be paid, for the article by the purchaser, regardless of whether or not there was a written invoice in existence. The agreement as to what constitutes the " invoice price " leaves to be determined on this appeal only the question whether the premiums furnished by the Larkin Company have a separate definite price, and if lost must be paid for at such price, without reference to the cost of the products with which they are sent as a premium, or whether they must be paid for at the *value of the lost articles to be proved;* and it being agreed that " invoice price " does not require the existence of a written invoice, but means the actual purchase price agreed upon and paid in advance, the question is whether the Larkin system of orders and sales with premiums furnished rests upon a fixed or definite cash price for premium merchandise between the customer and the Larkin Company. Does the proof here under review disclose such fixed cash price attaching to the premium merchandise separate from the products purchased with the premium merchandise, in accordance with the offers set forth in the catalogue?

Each cause of action of the five set forth in the complaint involves goods purchased under a different

catalogue, and it becomes necessary in order to determine the question involved to examine the offers contained in these catalogues.

Each catalogue consists roughly of three divisions: The first division is a general statement giving a detailed explanation of the so-called Larkin plan, telling the customer how to make out orders, and giving directions in minute detail as to the method of computing the cost of articles, making remittances, etc. The second division of the catalogue consists of an itemized list, illustrated with cuts of each of the so-called Larkin products — soap, perfumes, cereals, teas, paints, clothing, etc. The third division contains a list itemized, and illustrated with cuts, of the so-called Larkin premium merchandise.

Each catalogue contains an itemized order blank attached by a perforated margin. The customer fills out this blank, forwarding it with his remittance. This order blank contains a list of Larkin products, specifying in each instance the full list price of the products. It also contains blanks for listing or describing the premium desired by the customer, etc.

The fundamental requirement of all orders, as set forth in the statement of the Larkin plan, is that every order must total at least ten dollars at the full list price specified in the catalogue. "There is only one condition; that is, that each order shall be for not less than ten dollars worth of Larkin products at our catalogue prices, which are the same as usually charged at the stores."

The primary characteristic of the Larkin plan is that when an order is given for at least ten dollars worth of products at the catalogue list prices, the products will be furnished for five dollars cash payment, or one-half of the list price named in the catalogue.

Section 19 of the above catalogue reads as follows: *" Buy Larkin products at one-half the catalogue prices.* You will find the catalogue prices of the Larkin products (pages 18 to 38) at the same or less than similar articles cost at retail stores. You may buy for one-half of our catalogue prices ten dollars' worth or more of our products without premium merchandise. Every $5 thus expended means a cash saving of $5, which saving is the bonus."

Same catalogue, page 3, paragraphs 19 and 20, reads: " When you want to buy products or merchandise alone, you may buy Larkin products alone and pay only one-half the catalogue prices for them, provided your order amounts to $5 cash or more."

A customer who sends an order for products totaling ten dollars at the full list catalogue price has the following options:

1. He may buy the products alone, totaling at full list catalogue prices ten dollars, in which case he sends only five dollars cash with his order.

2. He may buy products totaling at full list catalogue prices ten dollars, and by remitting ten dollars in cash instead of five dollars may obtain a premium having a specified price of not more than five dollars.

3. He may send ten dollars cash, and instead of a five dollar premium take additional products amounting to ten dollars more at full catalogue list prices. In other words, take for his ten dollars cash, products whose list prices total twenty dollars.

4. He may buy products totaling at full list catalogue prices ten dollars, remitting ten dollars cash instead of five dollars, and instead of then selecting a premium he may defer the selection of a premium, and take from the Larkin Company coupons or a due bill to be used by him later, the due bill being described (section

65) as " a convenient form of acknowledgment of purchase of any quantity of Larkin products, issued when you wish to postpone selecting the merchandise bonus due you," and entitling the one named therein to premium merchandise to the value given with the quantity of products purchased. In some of the catalogues certificates were formerly issued redeemable in the same manner. By section 66, coupons are described as " tokens or merchandise bonus due," and they are issued only when asked for by secretaries of clubs, for distribution to purchasers of Larkin products in small quantities, etc. The precise method of arriving at the price of a premium is stated differently in some of the catalogues, but the above description of the method in which orders are given, and products and premiums are to be obtained, applies alike to all catalogues.

The Larkin Company business embraces two classes of goods: *first,* its own products, and *second,* its premium merchandise. And on page 17 of the same catalogue is found the advertisement: " You can buy premium merchandise alone (without products) at the *sold alone price* given in the offer." Sold alone prices are advertised in connection with all premium merchandise, and this price is the *bona fide* " invoice price " referred to in the uniform bill of lading.

The proof in the court below demonstrates that each of the premiums included in the several causes of action set forth in the complaint has a definite cash price ascertainable from the catalogue, and that the customers understand and pay this cash price. And the plaintiff and defendant having agreed that " invoice price " means the actual amount paid or agreed to be paid by the purchaser, the judgment of the City Court is affirmed, with costs.

Judgment affirmed, with costs.